## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ROBERT B. PADILLA and TINA M. PADILLA**,
as Co-Personal Representatives of the
**ESTATE OF ISAAC PADILLA**, Deceased,

       **Plaintiff,**

**vs.**                                   No.  1:18-cv-00102 BRB-KBM

**JOSHUA MORA,** in his individual capacity, and
**BOARD OF COUNTY COMMISSIONERS
OF BERNALILLO COUNTY** and **MANUEL
GONZALES**, in his individual and official capacities
as **BERNALILLO COUNTY SHERIFF,**

       **Defendants.**

## FIRST AMENDED COMPLAINT FOR
## CIVIL RIGHTS VIOLATIONS, TORT CLAIMS, AND DAMAGES

Robert B. Padilla and Tina M. Padilla, as co-personal representatives of the Estate of Isaac

Padilla, deceased, by and through their counsel, Kennedy, Hernandez & Associates, P.C. and the

Law Office of Nicole W. Moss, LLC, bring this First Amended Complaint for violation of Mr.

Padilla's civil rights under the Fourth Amendment to the United States Constitution and 42 U.S.C.

§ 1983, and for torts under the New Mexico Tort Claims Act and state common law.  Plaintiff

alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988

and 28 U.S.C. § 1343, with pendent jurisdiction over the state law claims.  Venue is proper in this

district, as Defendants are New Mexico residents.  All of the acts complained of occurred in New

Mexico.  Plaintiff's causes of action arose in New Mexico.

## PARTIES

2.      Robert B. Padilla is an individual resident of Albuquerque, New Mexico, acting as the co-personal representative of the Estate of Isaac Padilla for purposes of this wrongful death action.  Robert B. Padilla has been appointed as co-personal representative of Isaac Padilla by an order from the Second Judicial District Court, County of Bernalillo, State of New Mexico.  *See* Order Appointing Co-Personal Representatives, filed January 30, 2018 (*In the Matter of Isaac Padilla, Decedent*, No. D-202-CV-2018-00665).

3.      Tina M. Padilla is an individual resident of Gallup, New Mexico, acting as the co-personal representative of the Estate of Isaac Padilla for purposes of this wrongful-death action.  Tina M. Padilla has been appointed as co-personal representative of the Estate of Isaac Padilla by an order from the Second Judicial District Court, County of Bernalillo, State of New Mexico.  *See* Order Appointing Co-Personal Representatives, filed January 30, 2018 (*In the Matter of Isaac Padilla, Decedent*, No. D-202-CV-2018-00665).

4.      Defendant Joshua Mora is an individual resident of Bernalillo County, New Mexico. At all times relevant to this Complaint, Defendant Mora and the other sheriff's deputies involved in the events described in this Complaint were acting under color of state law within the scope of their employment as law enforcement officers and deputies of the Bernalillo County Sheriff's Department ("BCSD").  Defendant Mora is sued in his individual capacity.

5.      Defendant Manuel Gonzales is the Sheriff of Bernalillo County, New Mexico and served in that capacity during the time period relevant to this Complaint.  During that period, Defendant Gonzales was acting under color of state law within the scope of his employment and was personally responsible for exercising direct supervisory control over Defendant Mora and the other BCSD officials and deputies involved in the events described in this Complaint.  Defendant Gonzales acted as an official policymaker for the County with respect to the use of force, firearms,

2

vehicle pursuits, and shooting at vehicles, as well as training and supervising deputies with respect to those areas.

6.      Defendant Board of County Commissioners of Bernalillo County is a governmental entity located in Bernalillo County, New Mexico that employed and was charged with exercising direct supervisory control over Defendant Mora and the other sheriff's officials and deputies involved in the events described in this Complaint during the relevant time period.

7.      Defendant Gonzales was elected Bernalillo County Sheriff in the November 2014 general election, took office in January 2015, and has served as sheriff since January 2015.

## LEGAL FINDINGS AND PROFESSIONAL LITERATURE ON THE USE OF FORCE PUBLISHED BEFORE THE SHOOTING AT ISSUE IN THIS CASE

8.      At the time Defendant Gonzales took office in January 2015, the Civil Rights Division of the United States Department of Justice ("DOJ") was engaged in investigations of patterns and practices of excessive force which resulted in consent decrees with a number of law enforcement agencies throughout the country, including the Albuquerque Police Department ("APD") in Albuquerque, New Mexico.

9.      The City of Albuquerque is located within Bernalillo County, and the jurisdictional boundaries of the City of Albuquerque directly border Bernalillo County.  The Bernalillo County Sheriff's Department and the Albuquerque Police Department have entered into written agreements with one another with respect to sharing responsibilities for use-of-force investigations and responding to calls for service in areas of the City of Albuquerque and Bernalillo County which directly border one another.

10.     On or about April 10, 2014--more than three and one-half years before the officer-involved shooting at issue in this case--the DOJ publicly announced its findings regarding its civil investigation of allegations of a pattern and practice of excessive force by the APD ("2014 DOJ

Findings"). The 2014 DOJ Findings stated that the DOJ had reasonable cause to believe that the APD had engaged in a pattern or practice of use of excessive force and determined that "structural and systemic deficiencies – including insufficient oversight, inadequate training, and ineffective policies – contribute to the use of unreasonable force."

11.     The well-publicized DOJ findings issued on April 10, 2014, state that: "The most significant deficiency we observed in the department's training programs--both at the academy, where new recruits are trained, and in ongoing training that officers receive regularly--is the over-emphasis on using force, especially weapons, to resolve stressful encounters, and insufficient emphasis on de-escalation techniques. Much of the training leads officers to believe that violent outcomes are normal and desirable." "Also concerning is that it is impossible to ensure that the training that officers receive actually reflects the department's policies, the state of the law, and best practices in policing," because of the lack of documentation in the form of lesson plans or classroom materials. In a number of areas, the "training seemed to be entirely lacking or at least dangerously deficient," because of the absence of "refresher trainings on critical policies, such as the use-of-force policy, when those policies have been implicated in major incidents." Because the then-existing use-of-force training was "focused so heavily on weaponry and force scenarios," officers did "not get essential tools to engage in effective de-escalation methods."

12.     The chief deficiency noted in the 2014 DOJ Findings "is the department's failure to implement and objective and rigorous internal accountability system," and "the department's endorsement of problematic police behavior by failing to conduct thorough and objective reviews of officers' use of force." Thus, "problematic behavior continues to be viewed as reasonable, even exemplary, by supervisors."

13.     The 2014 DOJ Findings discuss several specific examples of excessive use of force involving fleeing suspects and/or shooting at vehicles, where "the officers' own recklessness . . . led

to their use of deadly force" against Andrew Lopez, Dominic Smith, Daniel Tillison, Megan Causey, and Mickey Owings. In addition to the 2014 DOJ Findings, there are published judicial opinions regarding some of these shootings. *See, e.g., Zia Trust Co. v. Montoya*, 597 F.3d 1150, 1154-55 (10th Cir. 2010); *Dorato v. Smith*, 108 F. Supp. 3d 1064, 1146-60 (D.N.M. 2015).

14.     The 2014 DOJ Findings also determined that "the department's policy regarding shooting at motor vehicles is outdated and inconsistent with best police practices," because "shooting at vehicles is generally a poor tactical choice and exacerbates the chances of vehicles becoming more dangerous instruments." In addition, the DOJ found "little evidence that officers have been following" the limitations on shooting at vehicles expressed in the department's existing policy. Instead, the DOJ's "review of incident reports revealed a practice of officers firing and injuring subjects in the cabin of their vehicle." The DOJ specifically found that: "The department's failure to update its policy to conform to modern police practices places its officers and citizens at a higher risk of harm."

15.     Tactical deployments in response to "high-risk traffic stops" were another area of concern addressed in the 2014 DOJ Findings. Due to a lack of "clear command structure or deployment guidance," tactical deployments suffer from "a near absence of organizational accountability." Instead, individual officers simply acted on their own without coordinating with, or awaiting authorization from, tactical experts. Such "lack of internal oversight has allowed a culture of aggression to develop," which "promotes an acceptance of disproportionate and aggressive behavior towards residents," and "emphasizes force and complete submission over safety." The few supervisors who did attempt to correct problematic conduct by individual officers "complained about the dearth of support from department leadership." And there was ineffective external or civilian oversight as well.

16.     The 2014 DOJ Findings proposed several remedial measures, including the

following:  (1) "Revise the use of force policy to prohibit shooting at vehicles," (2) "Revise the use of force policy to place more emphasis on de-escalation techniques and require officers to consider less-intrusive alternatives before employing force," (3) "In addition to a comprehensive use of force policy that incorporates all force options, including deadly and less lethal force, develop specific policies for each of the following areas:  (a) deadly force, [and] (b) firearms," (4) "Establish policies regarding force reviews and investigations" to remedy the accountability problems described above, (5) "Revise policies and procedures governing response to, and investigation of, high-risk incidents including specific guidance covering:  encountering suicidal subjects, barricaded subjects, hostage situations, and high-risk traffic stops," (6) "Implement scenario-based training and role playing to ensure officers understand de-escalation techniques and when force is justified.  This should include training on changes to policy, new equipment, and tactical methods," (7) "Ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, provide officers with the direction and guidance necessary to improve and develop as officers, and to identify, correct, and prevent misconduct," (8) "Ensure that the department's officer hiring and selection processes meet minimum standards for recruiting and an objective process for selection that employs reliable and valid selection devices," including "a valid psychological, medical, and polygraph examination to assess their fitness for employment," as well as "thorough, objective, and timely background investigations," (9) "prioritize effective, ethical, and community-oriented policing as criteria for promotion," and (10) "Revise the civilian oversight process to ensure that an effective system of review and approval implemented that includes review of serious uses of force and officer-involved shootings."

      17.    The DOJ and the City of Albuquerque entered into a Joint Statement of Principles regarding APD on July 24, 2014, and the reform proposals outlined above were developed and

implemented under the terms of a settlement agreement which was entered as an Order of the Court in *United States v. City of Albuquerque*, No. 14cv1025 RB-SV, Doc. 134 (D.N.M. memorandum opinion and order filed June 2, 2015). The Court's order noted that: "Both sides consulted with police experts and subject matter experts to ensure that the reforms would be efficacious and feasible." *Id.* The agreed reforms include the following use of force principles: "Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements: a) officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force; b) force shall be de-escalated immediately as resistance decreases; [and] c) officers shall allow individuals time to submit to arrest before force is used whenever possible. . . ." The agreed reforms further include the implementation of "an overarching agency-wide use of force policy," as well as "protocols for each weapon, tactic, or use of force authorized by APD" that incorporates "the use of force principles and factors articulated above," including "a policy that prohibits officers from discharging a firearm . . . at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another person, and such action is necessary in self-defense, defense of other officers, or to protect another person," with the caveat that: "Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle."

18.     Such policies and protocols are accompanied by specific training requirements covering topics such as "use of force decision-making" and "use of de-escalation strategies." There is also a requirement to "maintain complete and accurate records of all training provided to sworn APD officers during pre-service and in-service training programs, including curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records." The training requirements apply to sergeants and first-line supervisors as well.

19.     Since entering the consent decree with the DOJ, the City of Albuquerque has

substantially revised a number of its policies, including policies governing the use of force, firearms, and shooting at vehicles.  The progress of these reforms has been widely publicized in a number of forums, including the City of Albuquerque's web page regarding the DOJ settlement: https://www.cabq.gov/police/news/settlement-agreement-city-of-albuquerque-justice-department, as well as the public filings available through the United States District Court's CM/ECF database and free online opinions database:  http://www.nmcourt.fed.us/Drs-Web/input.

20.    The 2014 DOJ findings letter and statement of principles regarding the City of Albuquerque outlined above also were front-page news in the major media outlets serving Bernalillo County and the Albuquerque metropolitan area.  The DOJ findings letter issued in April 2014 came on the heels of the James Boyd shooting less than a month earlier, which generated widely publicized protests directly outside the Bernalillo County Sheriff's Department headquarters building, as well as nationwide media coverage of APD's excessive use of force.

21.    Many of the findings and recommendations resulting from the DOJ investigation of APD are not unique to that department but reflect the decades-long history and nationwide scope of the DOJ Civil Rights Division's investigations of local police and sheriff's departments concerning the pattern and practice of using excessive force.   The history and scope of the DOJ's investigations of other law-enforcement agencies are detailed in a set of findings published in a free online report dated January 2017 entitled "The Civil Rights Division's Pattern and Practice Police Reform Work:  1994-Present."  The findings in that report make clear that the purpose, intent, and effect of the DOJ Civil Rights Division's work is not limited to reforming one specific agency, such as the Albuquerque Police Department.  Rather, the report finds that:  "The Division's pattern-or-practice cases contribute to nationwide police reform by promoting a model of constitutional policing applicable to any size department, in any part of the country.  The Division's findings letters and reform agreements are closely scrutinized by law enforcement agencies that have never

8

been, and likely never will be, the subject of a pattern-or-practice investigation." An important part of the rationale for the Civil Rights Division's current reform model is that, "as many prominent policing scholars have noted, . . . its consent decrees can inform reform measures in police departments across the country." In prioritizing which of the more than 18,000 law enforcement agencies in the United States to investigate, "the national context of the Division's police reform efforts is a central consideration in the decision to open an investigation. The Division considers whether the allegations represent an issue common to many law enforcement agencies as well as whether the allegations represent an emerging or developing issue, such that reforms could have an impact beyond the primary objective of eliminating constitutional violations in the specific law enforcement agency."

22.     That is why "[m]any of the Division's investigations focus on core issues in police reform common to many law enforcement agencies--such as patterns of unlawful use of force." The Division's reform agreements across the country "often reflect a common set of substantive reforms . . . addressing unlawful use of force" and "departmental policy changes and re-training" regarding same. Thus, "several core principles emerge from the Division's reform agreements addressing force issues--principles that are reflected in best practices issued by national policing experts." These core principles common to reform efforts across the nation include, for example, "proportionality and de-escalation," as well as "prohibiting the use of retaliatory force."

23.     In addition to receiving the output of the DOJ's widely-publicized reform work in published reports such as the ones cited above, law-enforcement agencies and officials--including the Defendants in this case--may provide input while such an investigation is underway. For example, the expert consultants which the DOJ retains to work on such investigations often consist of "current and former police chiefs and deputy chiefs" who have "past experience in departments similar to the one under investigation, or with backgrounds tailored to the issues raised in a

particular investigation."

24.    The DOJ investigators also proactively engage local communities through town-hall meetings, the creation of voice and email mailboxes to receive information from community members, the use of community listservs, blogs, social media, and radio stations, and canvassing of places communities gather, including places of worship, street corners, apartment complexes, parks, shopping malls, and local businesses.  Thus, there was an abundance of opportunities for other law-enforcement agencies, and officials, including the Bernalillo County Sheriff's Department and Defendant Gonzales, to receive the DOJ's findings and participate in its investigations before hiring Defendant Joshua Mora and setting in motion the chain of events that led to the death of Plaintiff's decedent, Isaac Padilla, on or about November 17, 2017.

25.    In addition to the many avenues through which they receive notice of, and opportunity to participate in, investigations and reports published by the DOJ, Defendants in this case also are exposed to a large and well-publicized body of professional literature and educational events generated or sponsored by other organizations, including the Police Executive Research Forum (PERF), the International Association of Chiefs of Police (IACP), and the Major County Sheriffs of America (MCSA).  The PERF described 2014 as "a watershed year for American policing.  Events in Ferguson, Staten Island, Cleveland, Baltimore, and many other communities have put the entire policing profession in the United States under a microscope. . . .  Progressive, forward-looking police departments are responding to this increased scrutiny by taking a hard look at their organizations, how they function, and how they can improve."  PERF, *Use-of-Force Policy and Practice Review of the Fairfax County Police Department:  Final Report* at 86 (June 2015).  Excessive use of force in officer-involved shootings was a topic of widespread public concern during this period, and many of the same civil-rights investigations concerning the use of force documented in the DOJ publications cited above are also discussed in the PERF's July 2013 free

online report entitled "Civil Rights Investigations of Local Police:  Lessons Learned."

26.     The 2014 DOJ Findings which led to the consent decree with APD described above specifically cited and expanded upon a study conducted by the PERF and published in 2011 regarding the use of force by the APD.  The DOJ noted that concerns about the use of excessive force in Albuquerque date back to at least September 2010, when the PERF study was first commissioned.

27.     The PERF study resulted in a widely publicized report dated June 23, 2011--more than six years before the shooting at issue in this case--which recommended several specific policy changes with respect to the training and supervision that officers receive on the use of force.  *See* PERF, *Review of Use of Force in the Albuquerque Police Department* (June 23, 2011) (hereinafter "PERF Report on APD").  The PERF Report on APD specifically recommended that:  "**Officers Should Not Fire at or from Vehicles**.  The department's Use of Force Policy should prohibit officers from firing from or at a moving vehicle under all circumstances, except to save the officer or another person from death or grievous bodily injury, and when that threat is other than the vehicle itself."  Other recommendations in the PERF Report on APD included include:  (1) "placing even greater emphasis on the objective reasonableness of the actions of an officer in a use-of-force situation" and less emphasis on "use-of-force continuums/models" that "tend to over-step their usefulness by suggesting to officers that a specific action by a person justifies specific reaction(s) by the officer," (2) improvements in recruiting, hiring, and promotion techniques to ensure selection of personnel with adequate problem-solving and decision-making skills, (3) presenting "[a]dditional instruction in de-escalation techniques" to "officers at the entry level and at in-service training," (4) having department heads and training staff "meet with FTO's as a group at the end of their time with recruits specifically to discuss their impressions of the recruits' use-of-force decision making readiness," and to explain "[a]ny significant change in the department's policy or training that

impacts existing officers" by "attend[ing] roll calls to introduce the change," and (5) making changes to use-of-force reporting and investigation procedures to improve accountability and objectivity.

28.     The PERF Report on APD was widely publicized in media outlets serving Bernalillo County and the Albuquerque metropolitan area.  In addition, the PERF regularly engaged in efforts to target its message to law-enforcement officials throughout the country via memberships, meetings, free online reports, participation in conferences hosted by other law-enforcement groups, and dialogue with representatives of law enforcement labor union and employee organizations.

29.     For example, the PERF website shows that the PERF's general membership and board of directors consists of a diverse array of police chiefs, superintendents, sheriffs, state police directors, university police chiefs, public safety directors, and other executive heads of law-enforcement agencies, who are assisted by a research advisory board that includes professors from academic institutions throughout the United States.  The PERF's website includes a free online library of publicly accessible reports and studies bearing on the training, policies, and practices at issue in this lawsuit.

30.     Such reports and studies also document the PERF's hosting of, and attendance at, numerous national meetings of top law-enforcement officials from all over the country.  For example, on February 23, 2012, the PERF hosted a summit meeting in Washington, D.C., entitled "An Integrated Approach to De-Escalation and Minimizing Use of Force."  That meeting is documented in a free online report by the same name published in August 2012, which primarily consists of lengthy quotations from the numerous law-enforcement officials and experts in attendance, including the City of Albuquerque's police chief at the time, Ray Schultz.  On October 25, 2012, the PERF hosted another summit meeting in Washington, D.C., entitled "Civil Rights Investigations of Local Police:  Lessons Learned."  Again the meeting was later documented in the

free online report by the same name cited above, which outlines investigations of police and sheriff's departments throughout the nation conducted by the Justice Department's Civil Rights Division as of that date.  The report goes on to identify use of force as a key issue arising in many of those investigations, and further identifies several key elements of the reforms typically required in the consent decrees that result from those investigations.

31.     Also available from the PERF's free online library is a regularly updated document entitled "Guiding Principles on Use of Force," which summarized the results of numerous conferences, focus-group meetings, field studies, surveys, and reports the PERF has generated over the past decades.  A comparison between the issues and recommendations discussed in the PERF reports cited above and those discussed in the PERF Report on APD, shows that the message conveyed in the latter document is not unique to the City of Albuquerque nor is it uniquely addressed to law-enforcement officials employed by the City of Albuquerque.

32.     That the PERF's outreach efforts extend to, and are received by, law-enforcement labor union and employee organizations is documented in an article in the April 2017 issue of *Police Chief* magazine, as well as a document entitled *National Consensus Policy on Use of Force* developed by eleven of those organizations, which adopted the concept of de-escalation after years of PERF and Justice Department findings, recommendations, and consent decrees on the subject. A readers' poll in the April 2017 issue of *Police Chief* magazine reported that 72 percent of the departments participating in the poll had updated their use-of-force policies within the past two years.

33.     Technological advances which serve to de-escalate and reduce the need for use of deadly force and vehicle pursuits are also a frequent topic of discussion in the body of professional literature cited above.  For example, the National Institute of Justice has sponsored research on the use of launchable, mobile GPS tracking devices which allow law-enforcement personnel to track

a suspect vehicle's whereabouts electronically from a distance until they are in a position to stop the vehicle safely without provoking a dangerous high-speed chase.  Such technology, in the form of tracking device called "Starchase," has been commercially available to law-enforcement agencies since Defendant Gonzales took office in January 2015.  But it was not used during the vehicle pursuit at issue in the present case in November 2017.

34.    In addition, the DOJ launched a Body-Worn Camera Policy Implementation Project (PIP) in Fiscal Year 2015 to assist law-enforcement agencies with the enhancement or implementation of Body-Worn Camera (BWC) initiatives, which has provided over $41 million in funding to police agencies across the country to support such initiatives.  The DOJ also funded a training and technical assistance (TTA) program to help local communities implement their BWC PIP initiatives.  The DOJ contractor for the BWC-TTA program operates a free public website with information on body-worn cameras:  www.bwctta.com.

35.    On that website, the BWC-TTA Director has published an overview of research on the subject.  *See* James R. "Chip" Coldren, Jr., *In View:  BWCs and the Results of Randomized Experiments:  Understanding the Results of Randomized Experiments with Body Worn Cameras:  Key Considerations for interpreting research findings*, *available at* http://bwctta.com/resources/commentary/view-bwcs-results-and-randomized-experiments.  The BWC-TTA overview identifies several rigorous studies that have correlated BWC use with reductions in use-of-force incidents, as well as several factors which account for the results of the few studies which did not find such a correlation.  A careful review of the existing professional literature on the subject as a whole, "points to the conclusion that BWCs are beneficial to the police and to their communities."

36.    The PERF also has issued several reports and held several conferences on body-worn cameras.  In 2014, the PERF issued a report entitled "Implementing a Body-Worn Camera Program:

Recommendations and Lessons Learned."  An April 2017 PERF report which summarized the results of research studies on the subject stated that:  "Most studies of BWCs to date focus on two main outcomes, namely officer use of force and citizen complaints against officers.  Research points toward significant declines in both of these outcomes due to BWC implementation."  PERF, *Citizen Perceptions of Body-Worn Cameras:  A Randomized Controlled Trial*, at 4 (Apr. 2017).  An April 2018 PERF Report reiterates the conclusion that:  "Existing research provides empirical support for the idea that BWCs can lead to positive outcomes, such as reductions in use-of-force incidents and in complaints against police officers."  PERF, *Costs and Benefits of Body-Worn Camera Deployments*, at 7 (Apr. 2018).

37.     The latter report included results from a national survey which found that:  "More than 35% of respondents indicated that their agencies currently use BWCs, and almost 47% of respondents said they have plans to deploy cameras in the future."  "More than 85% of agencies that have adopted BWCs said they would "recommend" (19.3%) or "strongly recommend" (65.9%) that other agencies adopt BWCs."  The PERF survey was conducted in 2015 with an overall response rate of 74.2 percent (893 out of 1,203 surveys).

38.     A survey conducted by the Major Cities Chiefs of America (MCCA) and Major County Sheriffs of America (MCSA) in the Summer of 2015 reported that 19 percent of survey participants had body-worn camera (BWC) programs that were "fully operational" and nearly 77 percent of the remaining survey participants either "intend to implement" a BWC program, were in the piloting phase of such a program, or had completed the pilot but not yet fully implemented their programs.  Only 5 percent of the survey respondents said they either did not intend to implement a BWC program, or had completed a pilot but chose not to proceed with full implementation.  *See* MCCA & MCSA, *Survey of Technology Needs - Body Worn Cameras*, at ii (Dec. 2015).

39.     The IACP issued a model policy on body-worn cameras in 2014, and hosted a

symposium entitled "Body Worn Cameras:  Building a Secure and Manageable Program for Law Enforcement" in Washington, D.C. on January 21, 2016.  The results of the MCCA & MCSA Survey on BWCs (cited above) were reported at that IACP symposium.

40.     Upon information and belief, the Bernalillo County Sheriff's Department is a member of MCSA that was contacted in the survey cited above, but it provided no response.  Upon information and belief, Defendant Gonzales also has attended conferences of the IACP at which BWC policies are a frequent topic of discussion.  Defendant Gonzales has stated on multiple occasions that he does not intend to implement a BWC program for the Bernalillo County Sheriff's Department, and he had not done so at the time of the shooting at issue in this First Amended Complaint.

41.     In addition to conducting the BWC survey discussed above, the MCSA has functioned as a political advocacy group to oppose the reform efforts of the Justice Department's Civil Rights Division.  Nevertheless, the MCSA's own professional literature shows that the organization's members have access to, and are aware of, the DOJ's findings as well as the research conducted by more progressive organizations such as the PERF.  For example, the PERF's Executive Director, Chuck Wexler, facilitated a "town hall meeting" at the 2013 Summer Conference of the MCSA and the National Sheriff's Association (NSA) in Charlotte, North Carolina.

42.     On January 20, 2017, the MCSA posted a statement on its website opposing the "National Consensus Policy on Use of Force" developed by other law-enforcement labor union and employee organizations.  The MCSA's stated rationale for rejecting the IACP's *National Consensus Policy on Use of Force* at that time is that:  "Establishing a national consensus policy for response to resistance is impossible because laws, standards, community needs, desires and tolerances differ greatly.  A one size fits all policy is impractical; what is proper and accepted in one city or county

may be contrary to law and/or community tolerances in another."

43.     The DOJ findings and settlement agreement with APD resulted from the proactive engagement of local communities as described above and therefore reflect "the laws, standards, community needs, desires and tolerances" of the Albuquerque metropolitan area--which are relevant considerations under the MCSA statement cited above.  Thus, even if Defendants were to follow the MCSA's approach rather than the IACP model policy cited above, that approach would lead them right back to the findings, recommendations, and requirements that the DOJ made with respect to APD as the accepted community standards for law enforcement agencies working in the Albuquerque metropolitan area.

## DEFENDANTS' DELIBERATE INDIFFERENCE TO LAW ENFORCEMENT REFORM EFFORTS

44.     By ratifying, implementing, and pursuing policies and practices within the jurisdictional boundaries of the City of Albuquerque which are directly contrary to the findings and recommendations on which the DOJ settlement agreement with APD and the body of professional literature cited above are premised, Defendants are subverting and defeating the purpose and effect of that settlement agreement.   Individuals residing or traveling within the City of Albuquerque, including Plaintiff's decedent, Isaac Padilla, and the other occupants of the vehicle in which he was traveling on or about November 17, 2017, did not get the benefit of the protections afforded by DOJ's settlement agreement with APD, because Bernalillo County Sheriff's Department officials, including the Defendants in this case, have unilaterally taken over control of law-enforcement activities within the City's boundaries, including the investigation which led to the vehicle pursuit and use of deadly force at issue in this case.  When APD officers do not engage in a vehicle pursuit or use of deadly force because it would be contrary to APD policies and procedures under the settlement agreement with DOJ, Bernalillo County Sheriff's Department officials, including the

17

Defendants in this case, have taken matters into their own hands and proceeded to engage in the very activities in which APD officers are prohibited from engaging.

45.  Defendants actions in this regard are not limited to an isolated incident but form a pattern and practice which developed during the years and months preceding the shooting death of Isaac Padilla on or about November 17, 2017.  For example, the Bernalillo County Sheriff's Department, as well as its counsel and command staff, were specifically notified and advised of many of the PERF and DOJ Civil Rights Division materials and activities cited above in past litigation months before the shooting at issue in the present case occurred.  *See Vera v. Rodriguez*, No. 1:16-cv-00491-SCY-KBM, Doc. 34 (D.N.M. certificate of service filed Dec. 6, 2016), and Doc. 63 (D.N.M. certificate of service filed Apr. 19, 2017).

46.  During the pendency of the *Vera* litigation and in the months leading up to the shooting at issue in the present case, the number of officer-involved shootings by Bernalillo County sheriff's deputies increased significantly, including at least nine officer-involved shootings in 2017 alone.  This significant increase was widely reported in the media and identified as an issue of public concern.

47.  Despite being notified through many avenues of the widely publicized body of professional literature and legal findings cited above, including 2014 DOJ Findings, the entries of consent decrees by the APD and other law enforcement agencies throughout the country, significant revisions of similar policies by the APD since 2015, additional studies by the PERF, IACP, and other organizations, past litigation, and the availability of technological advances such as body-worn cameras and launchable mobile GPS tracking devices, Defendant Gonzales and his command staff chose to recklessly disregard such information and instead ratify, perpetuate, and expand upon a set of existing policies and practices regarding the use of force, firearms, vehicle pursuits, and shooting at vehicles by BCSD deputies, including Defendant Mora, which were known to cause constitutional

18

violations and an unreasonable risk of harm to members of the public, including Plaintiff's decedent, Isaac Padilla.

48.     A comparison of the pre-existing training, policies, and practices studied in the DOJ findings and investigations cited above with those identified in Bernalillo County Sheriff's Department Standard Operating Procedures and Defendants' Initial Disclosures to date reveals that Defendants' training, policies, and practices suffer from many of the same deficiencies identified in those findings and investigations.  In order to avoid learning the lessons on this topic that the DOJ was trying to teach, Defendant Gonzales and his command staff would have to deliberately blind themselves to all of the many channels through which the DOJ was trying to teach those lessons to other law enforcement agencies besides the one under investigation.

49.     The same is true of the PERF activities and materials cited above. A comparison of the pre-existing training, policies, and practices studied in the PERF reports with those identified in Bernalillo County Sheriff's Office Standard Operating Procedures (SOPs) and Defendants' initial disclosures to date reveals that Defendants' training, policies, and practices suffer from many of the same deficiencies identified in the PERF reports.  In order to avoid receiving the messages that the PERF was trying to communicate on this subject, Defendant Gonzales and his command staff would have to deliberately blind themselves to all of the many channels through the PERF was trying to communicate those messages to law enforcement agencies.

50.     Despite knowledge and awareness of the materials cited above before the officer-involved shooting which is the subject of this First Amended Complaint, Defendant Gonzales and his command staff did not modify Bernalillo County Sheriff's Department policies or procedures to implement the reforms specified in those materials.  On the contrary, they acted to subvert and bypass those reforms so that individuals residing or traveling in the City of Albuquerque would not benefit from them.

51.     For example, the versions of the Bernalillo County Sheriff's "Policy 314:  Use of Force" dated May 20, 2014, and May 22, 2012, which remained in effect after Defendant Gonzales took office in January 2015, contain many of the same critical defects identified in the PERF Report on APD, the 2014 DOJ Findings, and the Settlement Agreement in No. 14cv1025 RB-SV referenced above.  In particular, those versions of "Policy 314:  Use of Force," appear to emphasize the "use-of-force continuums/models" that "tend to over-step their usefulness by suggesting to officers that a specific action by a person justifies specific reaction(s) by the officer," and lack "[a]dditional instruction in de-escalation techniques."   The lack of emphasis on de-escalation or allowing a suspect to surrender is further reinforced by the "stand your ground" language stated in the Section 314-6 of the County Defendant's policy entitled "Deadly Force/Use."

52.     As documented in the PERF Report on APD, and the 2014 DOJ Findings, these types of deficiencies cause law-enforcement officers to believe that a specific action by a target (such as behavior consistent with flight from an officer's vehicle) grants the officer a retaliatory license to kill that target with no expiration date, no requirement to objectively reassess the situation based on the target's subsequent actions, and no requirement to give the target an opportunity to surrender or submit to the officer's show of authority when feasible to do so before proceeding with the use of deadly force.

53.     Although Defendant Gonzales and his command staff revised the Bernalillo County Sheriff's Department SOP 302 regarding vehicle pursuits dated November 25, 2014, after he took office in January 2015, those revisions aimed to expand the use of vehicle pursuits in a manner directly contrary to the professional standards exhibited in the body of professional literature and legal findings cited above.  While the 2014 version of SOP 302 only allowed deputies to pursue suspects in cases involving violent felonies or when there were "reasonable grounds to believe that the offenders have committed, or are attempting to commit a crime for which the necessity for

immediate apprehension outweighs the level of danger created by the pursuit," the new version of the policy which Defendant Gonzales and his command staff implemented on or before July 6, 2017, allows deputies to engage in vehicular pursuits of misdemeanor suspects if they believe the person is driving under the influence of alcohol or drugs or is "flagrantly reckless" and a danger to others on the road.

54.     The changes in policies and practices with respect to vehicle pursuits effected and implemented by Defendant Gonzales and his command staff in 2017 had an immediate and dramatic effect on the number, quality, and impact of vehicle pursuits which Bernalillo County sheriff's deputies conducted in that year.  While reports indicate that Bernalillo County sheriff's deputies performed only 13 vehicle pursuits in 2016 and 11 vehicle pursuits in 2016, the number of vehicle pursuits jumped to 74 in 2017, including 33 during the first six months of 2017.

55.     In contrast, APD reported conducting 10 vehicle pursuits in 2016 and 12 vehicle pursuits in 2017, under an APD policy which allows APD officers to engage in vehicle pursuits "only when an officer has reasonable grounds to believe the offender presents a clear and immediate serious threat to the safety of other motorists or the public, which is ongoing before the pursuit beginning, or the offender has committed or is committing a violent felony."

### DEFICIENCIES IN THE HIRING, TRAINING, AND SUPERVISION OF DEFENDANT JOSHUA MORA AS A BERNALILLO COUNTY SHERIFF'S DEPUTY

56.     The risk of harm to the public and other detrimental impacts caused by Defendants' failure to reform Bernalillo County Sheriff's Department policies and practices so they comply with the professional standards cited above is further evinced in the actions Defendant Gonzales and his command staff took with respect to the hiring, retention, and failure to adequately train or supervise Defendant Joshua Mora before his involvement in the officer-involved shooting of Isaac Padilla which is the subject of this First Amended Complaint.

57.     After taking office as Bernalillo County Sheriff in January 2015, Defendant Gonzales appointed Rudy Mora as the Undersheriff of the Sheriff's Department's Operations Bureau. Undersheriff Rudy Mora continued to serve as a member of Defendant Gonzales's command staff during the time period relevant to this First Amended Complaint.

58.     Defendant Joshua Mora is Undersheriff Rudy Mora's son.  Before Defendant Gonzales became Bernalillo County Sheriff and before Rudy Mora became Defendant Gonzales's Undersheriff, Defendant Joshua Mora applied to become a Bernalillo County sheriff's deputy, and his application was rejected by the previous sheriff.

59.     After Defendant Gonzales became Bernalillo County Sheriff and appointed Rudy Mora as his Undersheriff, Defendant Joshua Mora reapplied to become a Bernalillo County sheriff's deputy, and he was accepted into the Bernalillo County Sheriff's Department training academy. Upon information and belief, the hiring process was manipulated by Defendant Joshua Mora's father, Undersheriff Rudy Mora, so that Defendant Joshua Mora was allowed to enter the academy and receive training under his own terms.

60.     The hiring, academy training, field training, and appointment of Defendant Joshua Mora as a Bernalillo County sheriff's deputy was conducted under policies and customs promulgated, ratified, approved, and implemented by Defendant Gonzales, who had personal responsibility for their continued operation.  From the time Defendant Mora and other deputies involved in the shooting of Plaintiff's decedent, Isaac Padilla, applied for employment as Bernalillo County sheriff's deputies through the time of the shooting itself and the ensuing deadly-force investigation, their hiring, retention, training, and supervision by Defendant Gonzales and his command staff, including Undersheriff Rudy Mora, was deficient and not in compliance with the reforms recommended or required under the body of professional literature and legal findings cited above.

61.     While in the academy, Defendant Mora engaged in several instances of excessive force and aggressive, overzealous behavior which evinced his intentions, plans, and preparations for continuing such behavior once he received his commission as a sheriff's deputy.  Specific incidents of such behavior should have resulted in Defendant Mora's removal from the academy and prevented him from occupying the position of authority which he later abused when exhibiting excessive and deadly force against Plaintiff's decedent, Isaac Padilla.  Those prior incidents would have resulted in Defendant Mora's expulsion from the academy, or a requirement that he undergo additional remedial training to change his subsequent behavior, but for the intervention of Defendant Gonzales and Undersheriff Rudy Mora.

62.     While in the academy's driving course, Defendant Mora, along with two other cadets who later became involved in the incident which is the subject of Plaintiff's Complaint (Deputy Oleg Yurchenko and Deputy Mitchell Skroch), disregarded their trainers' instructions and drove aggressively and recklessly at excessive speed, knocking over cones.  Such misbehavior continued to such an extent that the instructors removed Defendant Mora from the track, and he was placed in jeopardy of not passing the course.  At that point, however, Defendant Gonzales and Defendant Mora's father, Undersheriff Rudy Mora, appeared at the track to intimidate the driving course instructors and pressure them to pass Defendant Mora despite his misbehavior, non-compliance, and failure to meet the requirements for the completing driving course.

63.     In the academy's officer survival course, Defendant Mora again exhibited aggressive, overzealous behavior that resulted in excessive force against his trainers and did not suffice to pass the requirements of the course.  While participating in a role-playing exercise involving a noncombative, nonresistant, handcuffed subject, Defendant Mora slammed the subject (Deputy Kevin Taft) onto the pavement unnecessarily.  While participating in another role-playing exercise involving a down-and-out subject during the same course in the academy, Defendant Mora struck

the subject (Deputy Autumn Neas) in the back of her head with knee strikes for not complying with his commands.  The force that Defendant Mora inflicted on Deputy Neas was so excessive that Deputy Neas suffered a concussion requiring her absence from work.  For a trainer to be injured to this degree as a result of a cadet's actions in the academy's officer survival course is highly unusual and should have resulted in Defendant Mora's expulsion from the academy, or a requirement that he undergo additional remedial training to conclusive demonstrate that he would no longer engage in such excessive, aggressive, and overzealous behavior.

64.      Due to the nepotism and undue influence of Defendant Gonzales and Undersheriff Rudy Mora (Defendant Mora's father), Defendant Mora was allowed to pass through the academy and become commissioned as a Bernalillo County sheriff's deputy despite evidence that he was not qualified under the professional standards cited above.  Had Defendant Gonzales taken note of and followed the guidance on hiring and training provided in the professional literature and legal findings cited above, Defendant Mora never would have made it through the academy or received a commission as a sheriff's deputy, based on the incidents described above.

65.      During his brief tenure as a Bernalillo County sheriff's deputy before the shooting of Isaac Padilla, Defendant Joshua Mora engaged in an unusually large number of vehicle pursuits. Under the training and supervision mechanisms described in the professional literature and legal findings cited above, such an unusually large number of vehicle pursuits in the first year of service as a sheriff's deputy would have triggered an "early warning system" or similar intervention to monitor and re-train the deputy so that he would not subsequently engage in the type of behavior he later exhibited when he used deadly and excessive force against Isaac Padilla.  Given Defendant Gonzales's deliberate indifference to that body of professional literature and the reforms ongoing in other, similarly situated law-enforcement agencies at the time, no such early warning or intervention was triggered for Defendant Mora prior to the shooting of Isaac Padilla on November

24

17, 2017.  On the contrary, vehicle pursuits were removed from the criteria for triggering the "early warning system" utilized by the Bernalillo County's Sheriff's Department's internal-affairs unit after Defendant Joshua Mora joined the department as a sheriff's deputy.

66.     In the professional literature and legal findings cited above, the DOJ's Civil Rights Division, as well as professional organizations such as the PERF, have extensively studied the causal relationships between particular regimes for training and supervising law-enforcement officers and use-of-force outcomes for those officers in recurring situations like shooting into the cabin of a vehicle or de-escalating a confrontation or crisis situation by safely providing suspects with a fair opportunity to surrender after they have committed a criminal offense or engaged in suspicious behavior.  Before November 2017, when the shooting at issue in this case occurred, those efforts produced relevant and reliable findings showing that a particular constellation of policies and procedures—which Defendant Gonzales and his command staff in the Bernalillo County Sheriff's Department used to hire, train, supervise, and retain deputies—were a "moving force" behind excessive force incidents in recurring situations like the one at issue in this case.

67.     The facts recited above show specific and affirmative links between the types of deficiencies identified in the professional literature as causing excessive-force incidents in recurring situations and the hiring, training, supervision, and retention of Defendant Mora--the deputy who discharged his firearm to cause the deaths of Plaintiff's decedent, Isaac Padilla.   Under these circumstances, where there is *both* continued adherence to a particular constellation of policies and procedures that Defendant Gonzales and his command staff knew or should have known will lead deputies to use excessive, deadly force against citizens in recurring situations *and* inaction in the face of known deficiencies with respect to hiring, training, supervision, and retention of a particular deputy who engages in the use of such excessive and deadly force in a specific instance, that instance of excessive and deadly force is a highly predictable consequence of the decision to adhere

to those inadequate policies and procedures.  "The high degree of predictability may also support an inference of causation—that the [county]'s indifference led directly to the very consequence that was so predictable." *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 409-10 (1997).

## THE VEHICLE PURSUIT AND USE OF DEADLY FORCE
## AGAINST ISAAC PADILLA ON OR ABOUT NOVEMBER 17, 2017

68.     It was under the circumstances described above that Bernalillo County sheriff's deputies, including Defendant Joshua Mora, became involved in a vehicle pursuit and use of deadly force involving Plaintiff's decedent, Isaac Padilla, on or about November 17, 2017.

69.     Defendant Mora shot Plaintiff's decedent, Isaac Padilla, and inflicted the gunshot wounds which caused his death on or about November 17, 2017, within the territorial boundaries of the City of Albuquerque. The vehicle pursuit by Defendant Mora and other Bernalillo County sheriff's deputies which preceded the shooting on that date also occurred within the territorial boundaries of the City of Albuquerque.

70.     APD officers were the ones who first identified the white Dodge pickup truck in which Isaac Padilla was traveling as the subject of a criminal investigation and requested air support from the Bernalillo County Sheriff's Department's "Metro One" helicopter.  The air support requested by APD officers commenced while the white Dodge pickup truck was in the vicinity of San Mateo Boulevard and Indian School Road within the territorial boundaries of the City of Albuquerque on or about November 17, 2017.

71.     The investigation of the white Dodge pickup truck in which Isaac Padilla was traveling before Defendant Joshua Mora pursued him and shot him to death commenced because of an APD officer's suspicion that the vehicle was stolen.  Before Defendant Mora and other BCSD deputies initiated their vehicular pursuit, they did not have any specific information that Isaac

Padilla was suspected of recently committing a violent felony or that he was armed and dangerous. They did not even have any specific information that Mr. Padilla was the individual who allegedly stole the white Dodge pickup truck in the first place.  Driving or being present in an allegedly stolen vehicle is not a severe enough crime to warrant a vehicle pursuit or use of deadly force under the body of professional literature cited above or the current APD policies regarding vehicle pursuits.

72.     The behavior that the driver of the white Dodge pickup truck exhibited when APD officers and the Metro One helicopter began tracking it did not show that the vehicle's occupants had committed or were committing a violent felony, nor did it present a clear and immediate serious threat to the safety of other motorists or the public, which was ongoing before the vehicular pursuit began.

73.     At the time the Metro One helicopter began tracking the movements of the white Dodge pickup truck between approximately 3:45 a.m. and 4:00 a.m. on a weekday morning in November, traffic on the roadways at issue was light.  The white Dodge pickup truck did not run over, collide into, or cause injury to any innocent motorists, bicyclists, equestrians, or pedestrians during the course of its travel from a gas station at San Mateo Boulevard and Indian School Road to the location of the shooting at Glenrio Road and Coors Boulevard.

74.     When APD officers and the Metro One helicopter began tracking it from the gas station at San Mateo Boulevard and Indian School Road, the white Dodge pickup truck first returned to its original location at that gas station.  APD officers had already detained a previous occupant of the vehicle who had exited to visit the gas station at that location earlier, and it was known to both the APD officers and Bernalillo County sheriff's deputies monitoring radio communications that the white Dodge pickup truck was carrying multiple occupants.

75.     After returning to the gas station, the white Dodge pickup truck traveled a short distance further and stopped to allow occupants to exit the vehicle before continuing on its way.

One occupant of the white Dodge pickup truck exited the vehicle at that time and surrendered to APD officers soon thereafter without a violent confrontation or struggle.  The occupants' behavior during this period did not present a clear and immediate serious threat to the safety of other motorists or the public.

76.     While air support is supposed to avoid or reduce the need for vehicle pursuits, in this case the deputies conducting and communicating the air support from the Bernalillo County Sheriff's Department's Metro One helicopter made the unilateral decision to switch radio channels from APD SE to BCSO North when it became apparent that APD officers were not engaging in a vehicle pursuit under the circumstances described above, and Bernalillo County Sheriff's Department personnel including Defendant Mora wanted to engage in such a pursuit.

77.     Even though the white Dodge pickup truck continued driving within the territorial boundaries of the City of Albuquerque, the sheriff's deputies conducting and communicating the air support from the Metro One helicopter declined APD's request to switch back to APD's radio channel and stated that the sheriff's deputies were "actively working a pursuit" at that point, even though no supervisor had yet authorized a vehicle pursuit in accordance with the Sheriff's Department's standard operating procedures.  The first-line supervisor for another area command, Sergeant Adam Gaitan, later gave the "10-4 for pursuit" even though the Metro One deputies still were providing air support and reported that the white Dodge pickup truck's "tires are shot" from the deputies' deployment of a mechanical tire deflation system known as "spike strips."

78.     The decision of Bernalillo County sheriff's deputies (including Defendant Joshua Mora, Deputy Sam Ungaro, Sergeant Adam Gaitan, Sergeant Tim Hix, and Lieutenant Steve Aragon) to decline APD's request to return to APD's radio channel and to escalate the investigation into a vehicle pursuit within the territorial boundaries of the City of Albuquerque under the conditions summarized above evinces knowing and reckless participation in a scheme to

manufacture grounds for using excessive force as part of a "culture of aggression," as well as a conscious disregard for the APD reform efforts documented in the sources cited above, during the time period immediately connected to Deputy Joshua Mora's use of excessive and deadly force.

79.     Defendant Mora and other Bernalillo County sheriff's deputies (including Sergeant Gaitan) knowingly and actively participated in a series of actions which recklessly escalated the situation and attempted to create grounds for using excessive force during the period preceding and immediately connected with Defendant Mora's discharge of his firearm into the cab of the white Dodge pickup truck.

80.     After the white Dodge pickup truck's tires were deflated by spike strips and Sergeant Gaitan directed other deputies under his command to continue their aggressive pursuit, the deputies engaged in a series of Pursuit Intervention Technique ("PIT") maneuvers which brought it to a stop and effected a seizure of its occupants at or beside the intersection of Coors Boulevard and Glenrio Road within the jurisdictional boundaries of the City of Albuquerque.  The white Dodge pickup truck's only contact with Bernalillo County Sheriff's Department vehicles occurred when deputies intentionally drove their vehicles into it as part of an actual or attempted Pursuit Intervention Technique (PIT) maneuver.  Upon information and belief, the PIT maneuvers on the white Dodge pickup truck by Bernalillo County sheriff's deputies were performed recklessly and in violation of professional standards, with the knowledge that the white Dodge pickup contained multiple occupants and had a high center of gravity which increased the risk of injury to all concerned.

81.     As the white Dodge pickup truck came to a stop at or beside the intersection of Coors Boulevard and Glenrio Road, other Bernalillo County sheriff's deputies converged on the scene to block the white Dodge pickup truck's path with their Sheriff's Department vehicles.  Defendant Mora parked and exited his Sheriff's Department vehicle behind and to the left of the white Dodge pickup truck, then approached it at a distance and location where Defendant Mora would be out of

the vehicle's path if it were to begin moving again.  From that location to the side and out of the path of the white Dodge pickup truck, Defendant Mora drew his firearm and discharged it into the driver's side window of the cab of the stationary white Dodge pickup truck approximately seven times, shooting Mr. Padilla while he was seated in the driver's seat and Mr. Martin Jim who was seated in the rear passenger seat.  Both Mr. Padilla and Mr. Jim died from the gunshot wounds inflicted by Defendant Mora.

      82.    By the time Defendant Mora discharged his firearm into the cab of the white Dodge pickup truck, thereby killing two of the vehicle's four occupants, the grounds which Defendant Mora and other Bernalillo County sheriff's deputies had attempted to manufacture in order to create and escalate the need for excessive force had dissipated to a point where the use of deadly force was not justified.  Any passing risk that the white Dodge pickup truck posed to deputies or others while traveling on the streets of Albuquerque before the shooting did not create an ongoing justification to kill otherwise unthreatening occupants of the vehicle in the moments after it came to a stop.  Even assuming that Defendant Mora or another deputy faced a situation in which they could justifiably use deadly force to stop the white Dodge pickup truck at some point during the vehicular pursuit which preceded the shooting, they did not retain the right to use deadly force with impunity at any time thereafter.

      83.    Neither Isaac Padilla nor any other occupant of the white Dodge pickup truck posed an immediate and serious threat to Defendant Mora or others at the time of the shooting.  It was not possible for the white Dodge pickup truck to suddenly move in the direction of a deputy or other person at the scene and strike him or her before he or she was able to safely retreat, and speculation regarding such a possibility was too remote to justify the use of deadly force at that point in time. As reported by the deputy handling communications from the "Metro One" helicopter, the white Dodge pickup truck's speed slowed significantly before coming to a stop, indicating that the

condition of the vehicle (with its tires deflated or missing), the intentions of its driver, or both meant the vehicle was not going to travel at speeds high enough to evade or threaten the deputies converging on the scene, who outnumbered Mr. Padilla and the three other occupants of the white Dodge pickup truck at the time.

84.     Before Defendant Mora fired the bullets which struck and fatally wounded Isaac Padilla and Martin Jim, the white Dodge pickup truck had come to a stationary position and was not in any immediate danger of moving or accelerating forward any significant distance, because its tires were deflated or missing and there was a high curb, as well as at least two sheriff's department vehicles (a Ford Expedition and a Ford Taurus), blocking its path in that direction.

85.     To the rear of the white Dodge pickup truck was an unoccupied, sandy, unpaved field which provided insufficient traction or flotation for the vehicle to escape from the deputies while its tires were deflated or missing.

86.     In the moments leading up to and including the shooting, no deputies or other individuals were in the immediate path of the white Dodge pickup truck, in a position where they were unprotected by other vehicles or unable to retreat if the white Dodge pickup truck moved forward or backward from its stationary position.  The white Dodge pickup truck was not facing Defendant Mora, nor was he immediately adjacent to it.

87.     Neither Isaac Padilla nor any other person who occupied the white Dodge pickup at the time it was stopped at or beside the intersection of Coors Boulevard and Glenrio Road had displayed or brandished a firearm, other handheld weapon, or an item resembling a firearm or handheld weapon.  Occupants were visibly present in the cab of the white Dodge pickup truck, but did not evince any threatening behavior.

88.     Neither Isaac Padilla nor the other occupants of the white Dodge pickup truck were actively resisting arrest or attempting to evade arrest by flight at the time of the shooting.  The

31

occupant of the front passenger seat was showing his hands in a gesture of surrender and compliance, while Mr. Padilla's hand was manipulating the floor-mounted gearshift and his foot was depressing the clutch pedal of the white Dodge pickup truck's manual transmission so that the vehicle's engine would not engage the gears.

89.     In order to disengage the gears and shut off the white Dodge pickup truck's engine so that Isaac Padilla and the vehicle's other occupants could safely exit the vehicle with their empty hands raised or visible in a gesture of surrender or compliance, Mr. Padilla and/or one of the vehicle's other occupants would first need at least a few moments to press down on the clutch pedal, manipulate the floor-mounted gear shift, and/or turn the ignition cylinder, then manipulate the vehicle's door locks and door handles to open the doors and come within range of hearing any commands that could have been issued by the deputies at that point.

90.     Performing these functions may take additional time and attention when the persons performing them are in an unfamiliar vehicle, which they have not been driving or riding in habitually for a long period of time, and when they are simultaneously trying to receive or process information concerning what is going on outside the vehicle.  The need to perform those functions in order to safely shut down and exit the white Dodge pickup truck for the purpose of effecting their surrender would have impaired the ability of Isaac Padilla and the vehicle's other occupants to simultaneously show their empty hands to the deputies in the moments between the time the white Dodge pickup truck came to a stop and the time Defendant Mora discharged his firearm.  In this regard, it took over two minutes after the shooting for the vehicle's two other occupants who remained alive to exit the vehicle and come to a position where they could be taken into custody by the deputies who surrounded them during that time.

91.     Defendant Mora did not give Isaac Padilla or the white Dodge pickup truck's other occupants sufficient time to safely effect a surrender and demonstrate compliance at the scene of the

stop when he discharged his firearm into the cab of the vehicle.

92.     The appearance or facial expressions that Isaac Padilla and the vehicle's occupants displayed in the moments immediately prior to the shooting were consistent with the severe panic or fright that any person would experience when confronted with at least two Bernalillo County sheriff's deputies pointing firearms directly at them at a time when it was common knowledge reported in the media that deputies from the same department had engaged in a recent string of deadly shootings, including instances where citizens were shot while attempting to surrender. Neither Mr. Padilla nor any of the vehicle's other occupants made threatening statements or threatening gestures toward Defendant Mora or other deputies at the scene in the moments before or during Defendant Mora's discharge of his firearm into the cab of the vehicle.

93.     Upon information and belief, when the white Dodge pickup truck came to rest at the corner of Coors Boulevard and Glenrio Road, Mr. Padilla depressed the vehicle's clutch pedal to disengage the gears and was in the process of shifting the vehicle's floor-mounted gearshift so the vehicle would not move in the direction of any other persons or vehicles in its path when he was shot in the head by Defendant Mora.  The gunshot wound to Mr. Padilla's head caused the immediate loss of all his motor skills, such that his foot came off the clutch pedal, the vehicle was shifted into reverse, and the vehicle moved backward at a slow speed for a short distance into an open, unpaved field where no other persons were in danger of being run over.  The vehicle safely came to rest in the sand at that point even though no one was driving it.

94.     No firearms or other deadly weapons were found on Mr. Padilla's person or in the white Dodge pickup truck in which he had been traveling.

95.     When Defendant Mora's shooting of Isaac Padilla gave rise to an investigation by a multi-agency task force led by the Bernalillo County Sheriff's Department, Defendant Gonzales and Undersheriff Rudy Mora intervened in that investigation to skew its results in favor of

33

Defendant Joshua Mora and pressure other deputies and other agencies, including the State Police, not to express findings or opinions that could be construed as unfavorable to Defendant Joshua Mora or the behavior he exhibited during the incident.  Upon information and belief, Undersheriff Rudy Mora, who was formerly employed by the New Mexico State Police, contacted that agency as well as BCSD Detective James Frederickson, to attempt to influence or direct the investigation of the shooting, despite the clear conflict-of-interest entailed by his status as Deputy Joshua Mora's father. Defendant Gonzales also prejudged the results of the investigation, and implicitly encouraged other deputies to do so, in his remarks at a press conference on November 28, 2017.

96.     Defendant Board of County Commissioners of Bernalillo County, acting through Defendant Gonzales and the Bernalillo County Sheriff's Department as the lead investigating agency, withheld and delayed disclosure of public records collected during the multi-agency task force investigation of the officer-involved shooting of Isaac Padilla from Plaintiff's counsel despite timely requests for those records under New Mexico's Inspection of Public Records Act.  For example, the heat-signature or "FLIR" video recording taken from the vantage point of the Bernalillo County Sheriff's Department's Metro One helicopter was not released to Plaintiff's counsel until June 11, 2018, although Defendant Mora was allowed to view that recording with his counsel before being interviewed by the multi-agency task force detectives on November 22, 2017. The investigation report by Detective Frederickson, which also was not released to Plaintiff's counsel until June 11, 2018, states that:  "The release of the air support video [to Defendant Mora and his counsel] was not discussed and I would not have approved of its release to Dep. Mora. Based on my training and experience, providing different perspectives of an incident can alter an individual's recollection of the incident."   Upon information and belief, there are additional irregularities and departures from professional standards which occurred or continue to occur during the course of the multi-agency task force investigation of the shooting led by the Bernalillo County

Sheriff's Department, which hamper Plaintiff's efforts to conduct timely discovery in this case and may result in the spoliation, suppression, or distortion of relevant evidence.

<u>COUNT I:</u>
**DEFENDANT MORA'S EXCESSIVE USE OF FORCE IN VIOLATION OF MR. PADILLA'S FOURTH AMENDMENT RIGHTS AND 42 U.S.C. § 1983**

97.     Plaintiff incorporates all of the preceding paragraphs as though fully set forth herein.

98.     Defendant Mora seized Mr. Padilla when the white Dodge pickup truck Mr. Padilla had been driving came to rest at or beside the intersection of Coors Boulevard and Glenrio Road in Albuquerque, New Mexico, on or about November 17, 2017, and Defendant Mora displayed his firearm in a show of authority.

99.     Defendant Mora used deadly physical force during his seizure of Mr. Padilla on or about November 17, 2017, including the infliction of fatal gunshot wounds from shots discharged from Defendant Mora's firearm.

100.     Defendant Mora's use of deadly force was excessive, objectively unreasonable, and unnecessary to effect the seizure of Mr. Padilla at the time the white Dodge pickup truck Mr. Padilla had been driving came to rest and was stationary at or beside the intersection of Coors Boulevard and Glenrio Road in Albuquerque, New Mexico, on or about November 17, 2017.  The use of such excessive force at that time did not serve a legitimate law-enforcement objective under the circumstances.

101.     Defendant Mora's actions were intentional, willful, wanton, and in gross and reckless disregard of Mr. Padilla's rights.

102.     Defendant Mora's use of excessive force proximately caused Mr. Padilla's damages and injuries, including his wrongful death, as described above.

WHEREFORE, Plaintiff requests compensatory and punitive damages against Defendant Mora, together with all costs and attorneys' fees.

**COUNT II:**
**STATE TORT CLAIM FOR WRONGFUL DEATH**
**BY BATTERY AGAINST DEFENDANT MORA**

103.    Plaintiff incorporates all of the preceding paragraphs as though fully set forth herein.

104.    While acting within the scope of his duties as a law enforcement officer as described above, Defendant Mora inflicted a battery which caused the wrongful death of Mr. Padilla.

105.    Defendant Mora acted with the unlawful intention to apply excessive force to, and cause harmful and offensive contact with, the person of Mr. Padilla, and such excessive, harmful, and offensive contact resulted from Defendant Mora's actions.

106.    Such excessive force and harmful and offensive contact caused the wrongful death of Mr. Padilla.

WHEREFORE, Plaintiffs request compensatory damages against Defendant Mora for the wrongful death of Mr. Padilla, together with all costs.

**COUNT III:**
**STATE TORT CLAIM FOR WRONGFUL DEATH**
**BY NEGLIGENCE AGAINST DEFENDANT MORA**

107.    Plaintiff incorporates all of the preceding paragraphs as though fully set forth herein.

108.    While acting within the scope of his duties as a law enforcement officer, Defendant Mora negligently operated machinery and equipment, including the handgun and bullet with which he shot Mr. Padilla.

109.    Defendant Mora's negligence as described above was a proximate cause of the wrongful death of Mr. Padilla.

WHEREFORE, Plaintiff requests compensatory damages against Defendant Mora for the wrongful death of Mr. Padilla, together with all costs.

**COUNT IV:**
**STATE TORT CLAIMS FOR**
**WRONGFUL DEATH AGAINST DEFENDANT GONZALES**

110.     Plaintiff incorporates all of the preceding paragraphs as though fully set forth herein.

111.     Defendant Gonzales, acting as a law enforcement officer through other BCSD officers within the chain of command, had a duty to members of the public at large, and to Mr. Padilla in this case, to exercise reasonable care in training and exercising supervisory control over BCSD sheriff's deputies, including Defendant Mora, so as not to cause the commission of any of the torts, statutory violations, or constitutional violations enumerated in Sections 41-4-6 and 41-4-12 of the New Mexico Tort Claims Act, including the use of excessive force, battery, and negligence by Defendant Mora alleged in Counts I, II, and III above, and the actions of other Bernalillo County sheriff's deputies alleged above.

112.     Defendant Gonzales, acting as a law enforcement officer through other BCSD officers within the chain of command, breached his duties as described above, thereby causing Defendant Mora and other Bernalillo County sheriff's deputies to commit one or more of the torts, statutory violations, or constitutional violations enumerated in Sections 41-4-6 and 41-4-12 of the New Mexico Tort Claims Act, including the use of excessive force, battery, and negligence by Defendant Mora alleged in Counts I, II, and III above, and the actions of other Bernalillo County sheriff's deputies alleged above.

113.     Defendant Gonzales's breach of his duties as described above proximately caused the wrongful death of Mr. Padilla.

WHEREFORE, Plaintiff requests compensatory damages against Defendant Gonzales for the wrongful death of Mr. Padilla, together with all costs.

**COUNT V:**
**MUNICIPAL LIABILITY OF DEFENDANT**
**BOARD OF COUNTY COMMISSIONERS OF BERNALILLO COUNTY**
**UNDER THE FOURTH AMENDMENT AND 42 U.S.C. § 1983**

114.     Plaintiff incorporates all of the preceding paragraphs as though fully set forth herein.

115.    As Bernalillo County Sheriff, Defendant Gonzales is an official policymaker on behalf of the Board of County Commissioners of Bernalillo County with respect to the use of force, firearms, vehicle pursuits, and shooting at vehicles by Bernalillo County sheriff's deputies, as well as the training and supervision on those subjects provided to those deputies, including Defendant Mora and the other deputies involved in the pursuit described above.

116.    The BCSD policies and practices regarding the use of force, firearms, vehicle pursuits, and shooting at vehicles, as well as training and supervision in those areas, constituted express policies of Bernalillo County, reflected widespread practices within BCSD that were so permanent and well settled as of November 17, 2017, that they constituted a custom or usage with the force of law at that time, and were promulgated, approved, ratified, and implemented through Defendant Gonzales's decisions as a person with final policymaking authority for the County.

117.    The BCSD policies and practices regarding the use of force, firearms, vehicle pursuits, and shooting at vehicles, as well as training and supervision in those areas, were a moving force behind, and had a direct causal link to, Defendant Mora's use of excessive force in violation of the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983 as alleged in Count I of this Complaint.

118.    County policymakers, including Defendant Gonzales and other BCSD officials under his command, had actual and constructive notice as of November 17, 2017, that there were particular deficiencies in the above-described policies and practices regarding the use of force, firearms, vehicle pursuits, and shooting at vehicles, as well as training and supervision in those areas, which caused local law enforcement officers to violate County residents' constitutional rights to be free from the use of excessive force.

119.    Under these circumstances, Mr. Padilla's damages and injuries, including his wrongful death, were highly predictable consequences of County policymakers' failure to correct

obvious and known deficiencies in the above-described policies and practices regarding the use of force, firearms, vehicle pursuits, and shooting at vehicles, as well as training and supervision in those areas, for which the County is liable under 42 U.S.C. § 1983.

120.    The failure of County policymakers, including Defendant Gonzales and other BCSD officials under his command, to timely and effectively correct the deficiencies in the above-described policies and practices regarding the use of force, firearms, vehicle pursuits, and shooting at vehicles, as well as training and supervision in those areas, evinced deliberate indifference and reckless disregard for known and obvious consequences of those deficiencies, including violation of County residents' constitutional rights.

WHEREFORE Plaintiff requests compensatory damages against Defendant Board of County Commissioners of Bernalillo County, together with all costs and attorneys' fees.

## COUNT VI:
## SUPERVISORY LIABILITY OF DEFENDANT
## GONZALES IN HIS INDIVIDUAL CAPACITY
## UNDER THE FOURTH AMENDMENT AND 42 U.S.C. § 1983

121.    Plaintiff incorporates all of the preceding paragraphs as though fully set forth herein.

122.    Defendant Gonzales promulgated, ratified, approved, implemented, and possessed personal responsibility for the continued operation of the BCSD's policies and practices with respect to the use of force, firearms, vehicle pursuits, and shooting at vehicles, as well as the training and supervision of Bernalillo County sheriff's deputies on those subjects.

123.    Those policies and practices promulgated, ratified, approved, and implemented by Defendant Gonzales were a close, direct, and proximate cause of Defendant Mora's excessive use of force against Mr. Padilla in violation of the Fourth Amendment and 42 U.S.C. § 1983, as alleged in Count I above.

124.    Defendant Gonzales acted intentionally, willfully, wantonly, recklessly, and with

deliberate indifference in promulgating, ratifying, approving, and implementing policies and practices which had the effect of depriving persons, including Mr. Padilla, of their constitutional right to be free from the excessive use of force by sheriff's deputies acting under color of state law.

125.   Under these circumstances, Mr. Padilla's damages and injuries, including his wrongful death, were a highly predictable consequence of Defendant Gonzales's deliberate indifference to the constitutional rights of County residents, for which Defendant Gonzales is liable in his individual capacity under 42 U.S.C. § 1983.

WHEREFORE Plaintiff requests compensatory and punitive damages against Defendant Gonzales in his individual capacity, together with all costs and attorneys' fees.

Respectfully submitted,

**KENNEDY, HERNANDEZ & ASSOCIATES, P.C.**

   /s/ Arne R. Leonard
Paul J. Kennedy
Jessica M. Hernandez
Arne R. Leonard
Elizabeth A. Harrison
Attorneys for Plaintiffs
201 12th Street NW
Albuquerque, New Mexico 87102
(505) 842-8662
pkennedy@kennedyhernandez.com
jhernandez@kennedyhernandez.com
aleonard@kennedyhernandez.com
eharrison@kennedyhernandez.com


Nicole W. Moss
THE LAW OFFICE OF NICOLE W. MOSS, LLC
201 Twelfth Street NW
Albuquerque, NM  87102
(505) 244-0950
nicole@nicolemosslaw.com

Attorneys for Plaintiff
Estate of Isaac Padilla

I hereby certify that a true copy of the foregoing First Amended Complaint was filed and served electronically to all counsel of record via CM/ECF on the date indicated on the notice of electronic filing.


    /s/ Arne R. Leonard